Nos. 126,998
126,999

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KRISTEN E. BROWN,
*Appellant*.

SYLLABUS BY THE COURT

1.

The rule allowing appellate courts to consider unpreserved prosecutorial error claims is not limited to jury proceedings; it applies to probation revocation proceedings as well.

2.

According to *State v. Ervin*, 320 Kan. 287, 566 P.3d 481 (2025), K.S.A. 21-6615 requires the district court to award one day of jail credit for each day a defendant is incarcerated pending disposition of the defendant's case regardless of whether he received an allowance for some or all that time against a sentence in another case.

Appeal from Sedgwick District Court; DAVID DAHL, judge. Submitted without oral argument. Opinion filed June 13, 2025. Affirmed in part, vacated in part, and remanded with directions.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

1

Before MALONE, P.J., SCHROEDER and CLINE, JJ.

CLINE, J.: Kristen E. Brown's probation was revoked after the district court found she violated its terms by committing an aggravated domestic battery and engaging in assaultive behavior. Brown challenges that decision by arguing the prosecutor erred in closing arguments when he discounted Brown's self-defense assertion which she claimed justified the actions that prompted the charges. She also claims the district court erred by awarding her jail time credit in only one of her pending cases.

After reviewing the record, we find that, even assuming the prosecutor's comments were erroneous, the error was harmless because the district court found Brown's testimony and version of events were not credible. That is, the alleged prosecutorial error did not affect the outcome of her revocation hearing. But, based on the Kansas Supreme Court's recent decision in *State v. Ervin*, 320 Kan. 287, 566 P.3d 481 (2025), we find the district court incorrectly calculated her jail time credit. We therefore affirm the decision revoking Brown's probation but vacate the district court's determination of jail time credit and remand for entry of an amended journal entry of judgment crediting Brown in both cases with all days she was incarcerated pending disposition of this case.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2021, Brown pled guilty to charges in two criminal cases, case number 19-CR-1478 (Case 1) and case number 19-CR-2775 (Case 2). At sentencing, the district court imposed consecutive prison terms but granted dispositional departures to probation in both cases.

The following year, Brown was ordered to serve two separate 60-day sanctions after violating the terms of her probation. Brown stipulated to the violations, which involved using drugs and alcohol and failing to report to her probation officer. Both

2

times, the district court ordered Brown's sentences would be suspended if Brown participated in in-patient drug treatment. The court also extended the term of her probation in one of the cases so both probation terms would expire at the same time.

On January 25, 2023, the State filed another warrant alleging Brown had violated the terms of her probation. This time, it alleged Brown committed a new crime— aggravated battery/domestic violence—and engaged in assaultive behavior. Brown's probation terms restricted violations of the law and engaging in assaultive behavior.

At the hearing on the State's allegations, two law enforcement officers, Officer Naomi Arnold and Detective Stewart Blurton, testified about the circumstances which led to the charge and warrant. Both officers were on duty on January 20, 2023, and responded to a domestic disturbance call at a home. When Officer Arnold arrived, she encountered Dale Olson near the front door. Olson had cuts on his right hand, and there was blood pooling on his clothing. Officer Arnold saw a major cut near Olson's wrist. Based on her training and experience, she believed a weapon had been used to inflict Olson's wounds.

Olson told Officer Arnold that Brown, who he identified as his girlfriend, inflicted the wounds. According to Olson, he was asleep in the bedroom when he awoke to Brown screaming at him about phone calls and text messages. She apparently "want[ed] to know who he was texting, who he was calling." As she kept screaming, Brown started stabbing Olson. Olson managed to get out of bed as the attack continued, and as he tried to wrap his wounds, he asked Brown to help him. She refused, saying that she wanted "to watch [him] bleed out and die." Olson left and went to a neighbor's house.

When Officer Arnold and Detective Blurton entered Olson's home, they noticed trails and pools of blood in the living room, kitchen, bedroom, and bathroom. Officer Arnold noted the house "was kind of like a crime scene on a television show. There was

3

blood everywhere." Detective Blurton went to the hospital to speak to Olson, where Olson recounted a similar version of events to what he told Officer Arnold.

Detective Blurton saw four deep cuts on Olson's right arm. Some of the cuts were deep enough that Blurton could see muscle and fat tissue. Based on his training and experience, Blurton did not believe all the cuts could have resulted from a single slice.

Olson also testified at the evidentiary hearing, but he described a slightly different version of events than what he had relayed to Officer Arnold and Detective Blurton. At the hearing, Olson said the disagreement started because Brown had his phone, and he tried to get it back. He claimed not to remember why Brown took his phone in the first place. According to Olson, at some point after he reached for his phone, he realized that he had been cut. He said he did not think that Brown cut him intentionally. Olson claimed that he thought Brown simply "had a reflex" as he reached for his phone, though he specified that he had not pulled a weapon or did anything to make Brown jumpy. He said he did not remember whether Brown told him that she hoped he died, nor did he remember telling police that Brown had made this comment. Olson testified that he ultimately realized he needed help for his injuries, so he walked to a friend's house. Olson said Brown was his "girl" and did not think she should be punished for her actions.

Paul Moss testified in Brown's defense. He and Olson were once friends and members of the same motorcycle club. Moss told the court that Olson accused Moss of having a romantic relationship with Brown. Moss also indicated he thought Olson was abusive to Brown. At the time of the incident, Brown was renting a room at Moss' house. He explained that Brown moved to his house as a means of extricating herself from her relationship with Olson.

Brown testified in her defense and provided yet another version of events. She said she was a recovering addict, and when she and Olson got back together, she insisted they

remain sober. Although she was living with Moss, she was staying the night at Olson's on January 19, 2023. After smelling methamphetamine, Brown reported that she walked from the bedroom into the living room and saw Olson on the couch. It appeared that Olson was "kind of passing out," and there was a bag of drugs next to him on the couch. Brown sat down, grabbed the bag of drugs, and threw it across the room. According to Brown, Olson had a meth pipe and torch in his lap. She told Olson that she needed to go home and that she would not "'do this'" with him. Brown claimed she told Olson she was "'clean'" and "'doing good,'" and that Olson "'could've been a drug addict'" and left her alone.

According to Brown, Olson then began smoking his meth pipe. As Brown sat on the couch, Olson turned toward her and blew smoke in her face and asked, "'Haven't you ever seen anybody relapse before, you bitch?'" Olson then grabbed her face, shoved her backwards into the couch, straddled her, and covered her mouth and nose. Brown testified that Olson "must've dropped the pipe," and it burned her arm. She claimed the meth pipe bowl stuck to her arm, but the stem disconnected and ended up between her fingers. According to Brown, as she pushed Olson to try to get him off her, the stem "went along his arm and cut him." After she pushed Olson, she saw that he was bleeding. Once Olson got off her, he searched for his drugs. Brown claimed that she had "no idea" where Olson's phone was throughout the entire incident. She testified that Olson tried to prevent her from leaving, but she was able to run to the bathroom and lock the door behind her. She said Olson searched the house for his drugs, and after finding the bag, he told her he was going to a neighbor's house. Once she heard Olson leave, Brown then left.

At the conclusion of the hearing, the district court found the State had met its burden of proving the violation alleged in the warrant, revoked Brown's probation, and imposed her underlying sentences. The court noted that it observed "deep cuts" on the back of Olson's right hand and wrist and found that Brown had caused the wounds by stabbing Olson.

The district court also found Olson's testimony that the wounds were inflicted accidentally was "very improbable." It emphasized the amount of blood in the home and the severity of Olson's wounds, as well as Brown's statement that she hoped Olson would bleed out and die. The court noted that no officers testified they found or smelled drugs in the house, and no other evidence corroborated Brown's claim that Olson was using drugs at the time of the incident.

This appeal follows.

REVIEW OF BROWN'S APPELLATE CHALLENGES

*Prosecutorial Error Claim*

Brown first contends the prosecutor erred in closing arguments at the hearing by arguing that under Brown's testimony and version of events, she was not entitled to claim self-defense because she was an initial aggressor. The prosecutor stated that the case "ultimately comes down somewhat to a credibility determination as to whether [Brown] and her version of a self-defense story that she proffers today and testifies to today is credible." After pointing out why the officers' testimony showed Brown's version of events was not credible, the prosecutor then argued that, even if the court believed Brown's version, Brown instigated the fight with Olson so her claim of self-defense is invalid.

*Preservation*

Brown admits she did not object to the prosecutor's statements that she now contends caused reversible error. But no objection is required to preserve the question of prosecutorial error for appellate review. *State v. Coleman*, 318 Kan. 296, 303, 543 P.3d 61 (2024). The State argues this rule should not apply to unpreserved prosecutorial error claims that do not occur in front of a jury. Yet it cites no authority for this permutation

6

and acknowledges that this court held the prosecutorial error rule applies to probation revocation proceedings in *State v. Ralston*, 63 Kan. App. 2d 447, 453, 529 P.3d 1275, *rev. denied* 317 Kan. 849 (2023).

We see no reason to carve out exceptions to our ability to consider unpreserved prosecutorial error claims based on the identity of the fact-finder and therefore decline to do so. Attorneys still cannot state facts not in evidence or mislead the fact-finder about the law even when the proceeding is to the court rather than to a jury. *State v. Wilson*, No. 114,567, 2016 WL 7324427, at *8 (Kan. App. 2016) (unpublished opinion). And as the State acknowledges, even though we generally consider this type of claim despite being unpreserved, the lack of objection is still relevant to determining the impact of the error on the proceedings. See *Coleman*, 318 Kan. at 303.

*Standard of Review*

An appellate court uses a two-step process to evaluate claims of prosecutorial error:  error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022). In determining whether prosecutorial error occurred, we must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded to prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, we must then determine whether the error prejudiced the defendant's due process rights to a fair trial. Prosecutorial error is harmless if the State can demonstrate beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). We reject the State's argument that we should shift the burden of proof to show error to the defendant

when the issue is not preserved by a contemporaneous objection, since, as the State acknowledges, this argument was recently rejected in *Coleman*, 318 Kan. at 307-11.

*Even assuming error, the prosecutor's statements did not prejudice Brown's due process right to a fair revocation hearing.*

We will proceed directly to the second prong of the prosecutorial error test since it is dispositive of Brown's claim. That is, we will assume for the purposes of this appeal, without deciding, that the prosecutor's statements rose to the level of prosecutorial error. Even so, we find this error was harmless because the district court found Brown's testimony was not credible. This is critical because the allegation of error was based on the prosecutor's arguments about Brown's version of events and testimony. Given that the court did not find Brown's testimony to reflect what happened in the case, the prosecutor's comments did not affect the outcome of the court's decision. In other words, since the district court did not believe Brown's story, it also did not believe her claim of self-defense. The prosecutor's statements—which were based on an alternative assumption that the court believed Brown's testimony—were irrelevant. The court accepted the prosecutor's primary argument—that Brown's story was not credible. The court had no need to reach the prosecutor's alternative argument, so it could not have impacted the court's decision.

Even so, Brown contends the district court was "moved by the State's argument that [Brown] had 'provoked' an attack upon herself." And it quotes only portions of the court's statements when reciting the evidence, which read in full:

"My notes reflected as questioned during the testimony, the defendant should simply just have left if that was the case instead of the altercation.

"I find that the defense raised a self-defense. It is improbable.

"I find that the defendant has violated. Once again, there was never any identification of any drugs, in particular meth, in the house. There was no odor of meth in

8

the house. There was no paraphernalia in the house, and the officers arrived shortly after the altercation. The defendant should have just left immediately."

Brown contends these comments mean the prosecutor's error could not be harmless because it shows the prosecutor's argument "resonated" with the court. Brown appears to imply that because the court stated she should have left Olson's house instead of getting into an altercation, it relied on the prosecution's alternative argument. She also appears to contend the prosecutor's argument affected how the court weighed Brown's testimony. Yet the court was clear that it found Brown's self-defense theory improbable because there was no evidence to support her testimony. For instance, much of Brown's version of events centered around drugs. But law enforcement found no drugs or drug paraphernalia in the house.

Because the district court did not find Brown's self-defense theory factually credible, we do not find the prosecutor's statements discounting that defense prejudiced her right to a fair hearing and therefore affirm the revocation of her probation.

*Jail Time Credit*

Brown next argues the district court erred in only awarding jail time credit in one of her sentences instead of both sentences.

At sentencing, the district court imposed suspended consecutive 39- and 40-month prison terms for Case 1 and Case 2, respectively. After the court revoked Brown's probation, the court entered two journal entries of judgment, one for each case. In Case 1, the court noted it would award 821 days of jail time credit. And in Case 2, the court listed the dates Brown was in custody which added up to 823 days. But it only awarded two days of jail time credit for this case.

Brown believes that the plain language of K.S.A. 21-6615(a), as interpreted by *State v. Hopkins*, 317 Kan. 652, 537 P.3d 845 (2023), entitles her to an award of 821 more days of jail time credit in Case 2. She asks this court to order the district court to correct the amount of jail time credit noted on its current journal entry of judgment for Case 2. And according to the Kansas Supreme Court's decision in *Ervin*, Brown is correct.

*Preservation*

Brown recognizes that she did not object to the district court's calculation of jail time credit below. But she validly maintains she had no chance to do so since the court did not address jail time credit in court during her probation revocation hearing. Instead, the court did so in the journal entries.

Generally, issues not raised to the district court cannot be raised on appeal. See *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022). There are limited exceptions to this rule. These exceptions permit parties to raise an issue for the first time on appeal. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). The exceptions are:

> "(1) [T]he newly asserted theory involves 'only a question of law arising on proved or admitted facts and the issue is finally determinative of the case'; (2) 'resolution of the question is necessary to serve the ends of justice or to prevent denial of fundamental rights'; and (3) the district court reached the right result for the wrong reason." 309 Kan. at 995 (quoting *Trotter v. State*, 288 Kan. 112, 124-25, 200 P.3d 1236 [2009]).

Brown asserts that the first two exceptions are met. First, since Brown does not dispute any jail time credit facts, she contends all that is left is to decide, as a matter of law, is whether the disputed time should be credited to one or both of her cases. Given that this is a question of law arising on undisputed facts, we can reach the merits of this issue.

10

Second, Brown asks us to reach the merits of this issue to protect her fundamental right to liberty. "Imprisonment . . . obviously impairs the right to liberty." *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 672, 440 P.3d 461 (2019). And if Brown is subjected "to a longer sentence without a legal basis [that] would be a miscarriage of justice." *State v. Williams*, 311 Kan. 88, 94, 456 P.3d 540 (2020). We agree this exception also allows us to consider Brown's unpreserved claim.

*Standard of Review*

Since this issue involves a question of law and the material facts are undisputed, our review is unlimited. *State v. Moore*, 309 Kan. 825, 828, 441 P.3d 22 (2019); *State v. Wheeler*, No. 127,241, 2025 WL 24833, at *1 (Kan. App. 2025) (unpublished opinion), *petition for rev. filed* February 3, 2025.

*Brown's jail time credit was incorrectly calculated.*

The right to jail time credit in Kansas is controlled by K.S.A. 21-6615. The statute provides:

> "In any criminal action in which the defendant is convicted, the judge, if the judge sentences the defendant to confinement, shall direct that for the purpose of computing defendant's sentence and parole eligibility and conditional release dates thereunder, that such sentence is to be computed from a date, to be specifically designated by the court in the sentencing order of the journal entry of judgment. Such date shall be established to reflect and shall be computed as an allowance for the time which the defendant has spent incarcerated pending the disposition of the defendant's case." K.S.A. 21-6615(a).

For decades, the Kansas Supreme Court interpreted the statute to mean that defendants could only receive jail time credit when they were being held *solely* on the crime charged. See *State v. Smith*, 309 Kan. 977, 981, 441 P.3d 1041 (2019); *Campbell v.*

11

*State*, 223 Kan. 528, 530-31, 575 P.2d 524 (1978). But the Supreme Court overruled this long-standing precedent in *Hopkins*, finding instead that "[a] defendant is entitled to jail time credit against his or her sentence for all time spent incarcerated while the defendant's case was pending disposition." 317 Kan. 652, Syl.

*Hopkins* dealt with only one sentence and applied jail time credit that related only to that one sentence. 317 Kan. 652. The *Hopkins* holding was therefore tailored to the narrow scope of the facts in that case because it does not address scenarios such as Brown's, where a defendant is ordered to serve consecutive sentences in multiple cases. But the Supreme Court recently dealt with this nuance in *Ervin*. There, the court held K.S.A. 21-6615 requires the district court to award one day of jail credit for each day a defendant is incarcerated pending disposition of the defendant's case regardless of whether he received an allowance for some or all that time against a sentence in another case. *Ervin*, 320 Kan. 287, Syl. ¶ 12. Accordingly, like Ervin, Brown is entitled to jail time credit in each of her pending cases.

The State argues that *Ervin* cannot apply to Brown's pending probation revocation appeal because she did not directly appeal her original sentence and so the sentence became final. We disagree. Brown could not have possibly raised a jail time credit issue in a direct appeal of her sentences since she initially received probation and neither of the sentencing journal entries addressed jail time credit. Her first opportunity to do so was when the district court revoked her probation and then calculated jail time credit. *State v. Storer*, 53 Kan. App. 2d 1, 3, 382 P.3d 467 (2016); see *State v. Smith*, 309 Kan. 977, 985, 441 P.3d 1041 (2019), *abrogated on other grounds by State v. Hopkins*, 317 Kan. 652, 537 P.3d 845 (2023). And since Brown's appeal of her probation revocation and jail time credit award was pending when *Ervin* was decided, the holding in *Ervin* applies to Brown's probation revocation appeal. See *State v. Mitchell*, 297 Kan. 118, 298 P.3d 349 (2013).

We therefore affirm the decision revoking Brown's probation but vacate the district court's determination of jail time credit, and remand this case to the district court with directions to enter an amended journal entry of judgment crediting Brown in Case 1 and Case 2 with all days she was incarcerated pending disposition of this case. And like in *Ervin*, we leave it to the district court's discretion as to whether a hearing is necessary to effectuate these instructions.

Affirmed in part, vacated in part, and remanded with directions.

\* \* \*

MALONE, J., concurring: I concur with the result reached by the majority, including the ruling on Kristen E. Brown's jail credit, but I take this opportunity to comment on the Kansas Supreme Court's decision in *State v. Ervin*, 320 Kan. 287, 566 P.3d 481 (2025), which now controls the jail credit issue. In my opinion, *Ervin* misconstrues the Kansas jail credit statute at K.S.A. 21-6615(a), and the Supreme Court should reconsider its holding in *Ervin* if Brown's case is reviewed.

The language of the Kansas jail credit statute has not substantially changed in the last 50 years. Compare K.S.A. 21-4614 (Weeks 1974) with K.S.A. 21-6615 (Self 2023). K.S.A. 21-6615(a) states in part:

> "In any criminal action in which the defendant is convicted, the judge, if the judge sentences the defendant to confinement, shall direct that for the purpose of computing defendant's sentence and parole eligibility and conditional release dates thereunder, that such sentence is to be computed from a date, to be specifically designated by the court in the sentencing order of the journal entry of judgment. Such date shall be established to reflect and shall be computed as an allowance for the time which the defendant has spent incarcerated pending the disposition of the defendant's case."

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). Although the statutory language has remained substantially the same over the years, our Supreme Court has inconsistently construed the jail credit statute. From 1978 until 2023, the court read the statute as only permitting credit for time the defendant spent in custody "solely" on the charge being sentenced. See, e.g., *State v. Smith*, 309 Kan. 977, 981, 441 P.3d 1041 (2019); *State v. Harper*, 275 Kan. 888, 890, 69 P.3d 1105 (2003); *Campbell v. State*, 223 Kan. 528, 530-31, 575 P.2d 524 (1978).

Kansas caselaw also was clear that a defendant could not receive duplicative jail credit when serving consecutive sentences in multiple cases. *State v. Davis*, 312 Kan. 259, 287, 474 P.3d 722 (2020); *State v. Lofton*, 272 Kan. 216, 217-18, 32 P.3d 711 (2001). The *Lofton* court stated that "K.S.A. 21-4614 contains no provision for credit in excess of the time an individual is actually incarcerated in jail." 272 Kan. at 217-18. The *Davis* court was equally clear: "[W]hen consecutive sentences are imposed for multiple crimes the defendant's time in custody can only be awarded against one of the sentences." 312 Kan. at 287. *Lofton* and *Davis* applied a common-sense rule that a defendant serving consecutive sentences in multiple cases should receive one day of credit—not multiple days—for every day the defendant spent in jail. Because the Kansas Legislature never substantially modified the jail credit statute during the years it was consistently construed by our Supreme Court, it was reasonable to presume that the court's interpretation of the statute reflected legislative intent. See *State v. Nguyen*, 304 Kan. 420, 425-26, 372 P.3d 1142 (2016) (when the Legislature fails to modify a statute to avoid a standing judicial construction, courts presume the Legislature agrees with that judicial construction).

But in October 2023, the Kansas Supreme Court construed our jail credit statute differently in *State v. Hopkins*, 317 Kan. 652, 655-59, 537 P.3d 845 (2023). The facts in *Hopkins* are important. Hopkins spent 572 days in jail awaiting sentencing for two counts of premeditated first-degree murder. At the same time, he was being held in custody on

14

charges in two other pending cases and a probation violation warrant, but the two other cases and the probation violation warrant were all dismissed as part of plea negotiations. Hopkins received concurrent hard-50 sentences for the murder convictions, but he was denied any credit for the 572 days he spent in jail because he was not held in custody solely on the murder charges. As a result, the 572 days Hopkins served in jail pending sentencing were not applied to *any* case for which he received credit.

On appeal, the Kansas Supreme Court acknowledged the longstanding precedent establishing that the jail credit statute only permits credit for time the defendant spends in custody solely on the charge being sentenced. But the court decided that K.S.A. 2022 Supp. 21-6615(a) "does not say that." *Hopkins*, 317 Kan. at 656. After discussing several jail credit cases over the years leading to some inconsistent results, the court ruled that Hopkins should receive 572 days of jail credit because that is how many days he spent in jail pending sentencing on the murder convictions. 317 Kan. at 659. The court expressly overruled its contrary holding in *Campbell*. *Hopkins*, 317 Kan. 652, Syl. The *Hopkins* decision did not address the rulings in *Davis* and *Lofton* denying duplicative jail credit for defendants serving consecutive sentences in multiple cases.

Appellate courts usually limit the holding in any case to the facts of the case. Because the facts in *Hopkins* did not involve a defendant receiving duplicative jail credit for consecutive sentences in multiple cases, and because *Hopkins* did not address or overrule *Davis* and *Lofton*, it was reasonable for Kansas lower courts to assume that the holdings in those cases prohibiting duplicative jail credit was still good law. That is how our court ruled in *State v. Feikert*, 64 Kan. App. 2d 503, 508-09, 553 P.3d 344 (2024).

But in *Ervin*, the Kansas Supreme Court clarified that K.S.A. 21-6615(a) allows a jail time credit for all time a defendant is incarcerated pending the disposition of a case, regardless of whether the defendant receives a credit for some or all that time against a sentence in another case. 320 Kan. at 311-12. The court ordered the defendant to receive

15

749 days of credit for all the time he spent in jail awaiting sentencing even though he was already awarded credit for some of the same days in another case for which he received a consecutive sentence. The *Ervin* court rejected the *Feikert* court's reliance on the precedent in *Lofton* and *Davis* prohibiting duplicative jail credit, finding "confusion caused by the *Campbell/Lofton/Davis* rule." *Ervin*, 320 Kan. at 310. In other words, the *Ervin* court overruled *Lofton* and *Davis* even though the court did not expressly say it.

The *Ervin* court based its analysis on the "plain language" of K.S.A. 21-6615(a), finding that the statute "is clear." 320 Kan. at 310. The court also found that "the plain language of K.S.A. 21-6615(a) does not necessarily lead to an absurd result." 320 Kan. at 310. But *Ervin* is wrong, the court's interpretation of K.S.A. 21-6615(a) does lead to an absurd result. All we need to do to reach this conclusion is to examine Brown's two cases. Here, we are remanding Brown's cases with directions for the district court to award her an additional 821 days of jail credit in one case even though she already received credit for the same days in another case for which she is serving a consecutive sentence. Brown will receive 1,642 days of jail credit between the two cases for serving only 821 days in jail. Had Brown had a third case pending in district court, she would receive an even greater windfall. While I am sure that Brown appreciates this gift from the Kansas Supreme Court, I am equally sure that the Kansas Legislature never intended this result.

The Kansas criminal code contains many provisions mandating consecutive sentences. A common example is when an offender commits a new crime while on probation. See K.S.A. 21-6606(c). Typically, when an offender commits a new crime while on probation, the offender will be held in custody on the new charge and also on a probation violation warrant awaiting disposition of both cases. Ultimately, the offender's probation will be revoked and the offender will be sentenced on the new conviction consecutive to the sentence in the probation violation case. Under *Ervin*, the defendant will receive duplicative jail credit in each case even though such jail credit runs counter to the legislative mandate that the sentences in the two cases be consecutive. It will

16

behoove an offender to delay disposition of the cases for as long as possible in district court while the offender piles up duplicative jail credit in multiple cases.

The Kansas Legislature amended K.S.A. 21-6615 to address the ruling in *Hopkins* even before *Ervin* was decided. See L. 2024, ch. 96 § 7. Under the amended statute, "[a]ny time awarded as credit in another case when consecutive sentences are imposed on a defendant" will not be considered as time spent incarcerated pending disposition of the defendant's case. K.S.A. 2024 Supp. 21-6615(a)(2)(A). The amended statute makes clear that a defendant will not receive duplicative jail credit when ordered to serve consecutive sentences in multiple cases—the common-sense way the jail credit statute was construed under *Davis* and *Lofton*. To me, this action reflects a legislative intent for the jail credit statute to have been construed this way all along. Presumably, jail credit under the amended statute will only apply to crimes committed after the effective date of the amendment, but this issue has not yet been addressed by any Kansas appellate court.

The situation we are now facing with the jail credit issue reminds me of the predicament Kansas courts faced following the Supreme Court's decision in *State v. Murdock*, 299 Kan. 312, 323 P.3d 846 (2014), *overruled by State v. Keel*, 302 Kan. 560, 357 P.3d 251 (2015). In *Murdock*, a divided Kansas Supreme Court held that when calculating a defendant's criminal history that includes out-of-state convictions committed before the 1993 enactment of the Kansas Sentencing Guidelines Act (KSGA), the out-of-state convictions must be classified as nonperson offenses. 299 Kan. 312, Syl. ¶ 5. In reaching this decision, the court construed K.S.A. 21-4711(e) governing the classification of out-of-state convictions and found that the reference to comparable Kansas offenses in that statute should be determined as of the date the out-of-state offenses were committed. 299 Kan. at 317. The court overruled all prior Kansas caselaw that had construed the statute differently. 299 Kan. at 319. Because Kansas did not designate crimes as person or nonperson before the 1993 enactment of the KSGA, the result of the *Murdock* holding was that out-of-state pre-KSGA convictions for crimes

17

such as murder, rape, and aggravated indecent liberties with a child needed to be scored as nonperson offenses for criminal history purposes—a result that clearly was never intended by the Kansas Legislature when it enacted the KSGA. The *Murdock* majority absolved itself of any blame for this absurd result by stating that the solution to the problem sits with the Legislature. 299 Kan. at 319.

The reaction to *Murdock* was swift. Kansas district courts were soon flooded with motions to correct illegal sentences filed by inmates alleging that their sentences were based on an incorrect criminal history score. Our court's dockets were soon clogged by appeals from rulings on those motions.

The following year in *Keel*, the Supreme Court determined that *Murdock* was wrongly decided after all and overruled the decision. *Keel*, 302 Kan. 560, Syl. ¶ 9. In *Keel*, the court recognized that there is no explicit language in the KSGA telling courts precisely how to classify out-of-state pre-KSGA convictions as person or nonperson offenses for criminal history purposes. 302 Kan. at 572. But given the overall design and structure of the KSGA, the court determined that the classification of a pre-KSGA conviction as a person or nonperson offense for criminal history purposes is determined based on the classification in effect for the comparable Kansas offense at the time the current crime of conviction was committed. 302 Kan. at 573, 589-90. This determination allowed Kansas courts to classify pre-KSGA convictions just like courts typically had been determining criminal history scores before *Murdock* was decided.

I bring up the *Murdock/Keel* episode because I think we now have a similar situation with the jail credit issue. K.S.A. 21-6615(a) was never "clear" on whether a defendant could receive duplicative jail credit when serving consecutive sentences in multiple cases because the statute does not directly address the question. This prospect introduces ambiguity into the statutory scheme allowing courts to employ canons of construction to ascertain legislative intent. *State v. Betts*, 316 Kan. 191, 198, 514 P.3d

18

341 (2022). When construing statutes to determine legislative intent, appellate courts must consider various provisions of an act *in pari materia* with a view of reconciling and bringing the provisions into workable harmony if possible. *State v. Strong*, 317 Kan. 197, 203, 527 P.3d 548 (2023). The courts must construe statutes to avoid unreasonable and absurd results. *State v. Smith*, 311 Kan. 109, 114, 456 P.3d 1004 (2020).

In a situation like this, the jail credit statute should be construed in harmony with the general sentencing provisions contained in Article 66 of the Kansas criminal code, including the provisions mandating consecutive sentences in some instances. K.S.A. 21-6615(a) states that the beginning date for a defendant's sentence "shall be computed as an allowance for the time which the defendant has spent incarcerated *pending the disposition of the defendant's case*." (Emphasis added.) The most sensible interpretation of this language is that a defendant does not receive jail credit in a case when the defendant has already received credit for the same days in another case and the sentences are consecutive. The *Ervin* court's interpretation of K.S.A. 21-6615(a) flies in the face of the criminal code's sentencing scheme mandating consecutive sentences in some cases.

The court in *Davis* and *Lofton* had construed the jail credit statute in a sensible and practical manner prohibiting duplicative jail credit for defendants serving consecutive sentences in multiple cases. The Supreme Court was unwise to abandon this approach in *Ervin*, and it was unnecessary for the court to do so. The *Hopkins* court correctly overruled the holding in *Campbell* permitting credit for the time the defendant spends in custody solely on the charge being sentenced. Under *Campbell*, a defendant held in custody in multiple cases could be denied jail credit in *any* of the cases. But it does not follow that the court needed to overrule its longstanding precedent in *Davis* and *Lofton* prohibiting duplicative jail credit in consecutive sentences in multiple cases.

The fallout from *Hopkins/Ervin* may not be as substantial as the fallout from *Murdock*, it is still too soon to tell. But there are probably a great number of nonfinal

19

sentences in pending Kansas cases that will be affected by the court's decision in *Ervin*. Issues will be raised and arguments will be made about jail credit in those cases in the district courts of Kansas, and the cases will work their way through the appellate courts. That is what happens when the Supreme Court overrules years of settled caselaw construing a Kansas sentencing statute without perhaps fully considering or understanding the ramifications of its decision.